UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
———

| | | |
|---|---|---|
| DAVID DOUGLAS McCLOY, # 471229, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 5:06-cv-04 |
| | ) | |
| v. | ) | Honorable Janet T. Neff |
| | ) | |
| MARY BERGHUIS, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus proceeding brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Oakland County Circuit Court after a jury trial on charges of first-degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a), first-degree felony murder, MICH. COMP. LAWS § 750.316(1)(b), first-degree home invasion, MICH. COMP. LAWS § 750.110a(2), and three counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b(1). The Oakland County Circuit Court vacated the home invasion conviction, and by judgment entered September 30, 2003, imposed concurrent prison terms of life without parole on the murder convictions, to be preceded by three consecutive terms of two years' imprisonment on the felony-firearm convictions. On direct appeal, the Michigan Court of Appeals vacated one of the murder convictions and two of the firearm convictions on double jeopardy grounds but affirmed the conviction and sentence in all other respects. The Michigan Supreme Court denied discretionary review on November 29, 2005.

The *pro se* habeas corpus petition, filed on January 5, 2006, raises four grounds for relief: (1) prosecutorial misconduct arising from the knowing use of perjured testimony; (2) ineffective assistance of trial counsel; (3) prosecutorial misconduct arising from alleged manipulation of the evidence, use of "gruesome pictures" and other due-process violations; (4) insufficiency of the evidence to sustain a first-degree murder conviction. Respondent has filed an answer to the petition (docket # 11) supported by the trial and appellate records. Respondent's answer concedes that all claims raised in the *pro se* habeas corpus petition were adequately exhausted in the state courts and seeks denials of those claims on their merits. Petitioner has filed a 107-page response to the answer (docket # 26), a supplemental brief (docket # 40), two further supplements (docket #'s 43, 44), and a 77-page "traverse" (docket # 53). In addition to arguing in favor of the four claims in the habeas corpus petition, these documents attempt to inject extra-record facts into these proceedings, as well as claims neither contained in the petition nor presented to the state courts.

This matter has been referred to me for review of the record and submission of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 10 of the Rules Governing Habeas Corpus Proceedings in the District Courts. Upon review of the record and the submissions of the parties, I conclude that the four claims contained in petitioner's habeas corpus petition are palpably meritless. I therefore recommend that the petition be denied on its merits.

## Proposed Findings of Fact

The Oakland County Circuit Court prosecution arose from the murder of John Polish in Waterford Township, Michigan, on August 20, 2002. The victim, a 44-year-old father of two and

former co-worker of petitioner, was shot four times in the back at close range.  On direct review, the

Michigan Court of Appeals summarized the facts of the case as follows:

> At one point, both the victim and defendant worked as loan officers for a mortgage company.  According to the men's supervisor, defendant had grown increasingly frustrated with his job before he abruptly quit in September 1998.  Subsequently, defendant began to send threatening faxes to the business offices.  At first, the faxes were aimed at both the victim and the supervisor.  Eventually, however, the victim became the sole target of defendant's anger.  Defendant also began to make threatening phone calls to the victim's home.  The police departments in the areas where the victim lived and worked were contacted.  At one point, the victim attempted to obtain a personal protection order (PPO) against defendant.  The victim also installed a home security system and apprised his neighbors of the situation so that they could be on the look out for defendant.
>
> Several of the victim's neighbors testified that at approximately 7:45 on the evening the victim was shot [August 20, 2002], defendant was seen parked outside the victim's home.  Soon after defendant entered the home through the garage, shots were heard, followed by defendant leaving the home and driving away in his car.  Thereafter, defendant's [sic, should be "decedent's"] two children and two neighbor children who had been in the home ran out screaming that the victim had been shot.  Neighbors immediately rushed to the home, but the victim was already dead.  He had been shot four times at close range.  The bullets fired came from the gun found in defendant's possession at the time of his arrest minutes after the shooting.

(Mich. Ct. Appeals Op. at 1-2, docket # 22).

### A.    Trial Court Proceedings

The prosecution began in 51st District Court with the filing of a complaint against

petitioner charging him with six felony counts:  first-degree premeditated murder, murder committed

during the course of committing another felony (first-degree home invasion), first-degree home

invasion, and three counts of possession of a firearm during commission of a felony.  The district

court appointed Michael McCarthy as defense counsel.  Mr. McCarthy requested that petitioner be

committed to the Forensic Center for a competency evaluation.  Petitioner was examined by Dr.

-3-

Thomas D. Shazer on an unrelated criminal charge and was found incompetent on October 1, 2002. After being medicated, he was evaluated on the present charges on November 19, 2002, and was found competent to stand trial by John Scully, MSW.

Petitioner and counsel appeared before the district court, Honorable Phyllis C. McMillen, on December 19, 2002, for a competency hearing and preliminary examination. The court received the written report of the forensic examiner, who opined that petitioner was competent and would remain so as long as he took his prescribed medications. (*See* Transcript of Preliminary Examination (PE), docket # 15, at 4-5). On the basis of the report from Mr. Scully, the court found petitioner competent to stand trial. (*Id.*, 5). The district court then heard testimony from the chief medical examiner and eye witnesses to the crime. At the end of the proceeding, the court found sufficient evidence to bind over petitioner for trial on all six felony charges. (PE , 99-104).

At the arraignment, defense counsel moved in the Oakland County Circuit Court for an independent forensic evaluation concerning both petitioner's competence and his criminal responsibility. (Transcript, docket # 16, at 3-4). The court granted permission for a second evaluation, which was performed by Dr. Jack Haynes, an independent evaluator appointed by the court. The parties appeared before Circuit Judge Colleen O'Brien on May 20, 2003, for a hearing on competency. The court received the report from Dr. Haynes, who found that petitioner was both competent to stand trial and was criminally responsible at the time of the murder. On the basis of the report from Dr. Haynes, the court found petitioner competent for a second time. (Hearing Transcript, docket # 17).

-4-

Jury trial in the Oakland County Circuit Court began on September 11, 2003.[1]  At the outset of trial, the prosecution moved to exclude evidence from the forensic examiners, because petitioner had withdrawn his insanity defense.  The court granted the motion *in limine*.  (TT I, 13).  Defense counsel moved to exclude six color pictures of the victim on the ground that they were cumulative and prejudicial.  After hearing argument, the court found that the pictures were probative of both petitioner's intent and the credibility of witnesses and that they would not cause any undue prejudice to petitioner.  (TT I, 21).

The prosecution's case was based on the testimony of nine witnesses, plus thirty-three exhibits.  The witnesses were Ljuvisa Jovan Dragovic (the Chief Medical Examiner for Oakland County), Greg Gwizdowski (petitioner's former employer), Sheri Polish (the victim's wife), Christian Collis (one of the persons who saw petitioner enter the victim's house immediately before the shooting), Cheryl Biron (an eye witness who saw the victim's children run out of the house immediately after the shooting), Vanessa Giroux (a neighbor who heard gunshots and then saw petitioner leave the house and throw something into his car), Mark Giroux (a neighbor who heard five gunshots and then observed petitioner leaving the victim's house), Mike Post (a Waterford Township police officer who stopped petitioner's vehicle shortly after the shooting and found ammunition and the murder weapon in petitioner's car), and Christopher S. Tippen (a crime scene investigator who testified concerning physical evidence).  Petitioner called no witnesses, but introduced six photographs into evidence.

---

[1] The trial transcript spans three volumes, reflected in the record of this court as docket #'s 18, 19 and 20.

Relevant to the issues now pending in this habeas corpus action, the witnesses testified as follows:

Dr. Ljuvisa Jovan Dragovic

Dr. Dragovic, the Chief Medical Examiner, performed an autopsy on John Polish on August 21, 2002, the day after the murder. (TT I, 229-39). He testified that the decedent suffered four gunshot wounds. There was an entrance wound to the back of the head surrounded by gunpowder stippling one and three-quarter inches in radius. (*Id.*, 240-41). This would indicate that the muzzle of the gun was two to twelve inches from the back of the victim's head when it was fired. (*Id.*, 241-42). People's Exhibit 3 showed the entrance wound to the back of the victim's head. The bullet went through the skull, damaged the brain, and came through the front of the skull, lodging beneath the skin on the left side of the forehead. (*Id.*, 242-43). The next wound was an entrance wound to the left upper back eighteen inches below the top of the head and five inches to the left of the back midline. (*Id.* at 244-45). The bullet fractured a rib in the back, went through the upper lobe of the lung, perforated the lower part of the aorta and the right lung and was found in the right chest cavity. (*Id.*, 245-46). This wound caused massive bleeding in the chest cavity because of the injury of major organs and blood vessels. (*Id.*, 246).

The next gunshot wound was an entrance wound in the victim's side, ten inches to the right of the back midline. (TT I, 246). This gunshot wound showed no gunpowder residue. The bullet went through the right chest cavity, through the diaphragm, liver, and gall bladder, and then exited at the mid upper belly. (*Id.*, 246-47). This bullet also caused massive bleeding because of serious injury to organs. The fourth gunshot wound struck the victim's left forearm, entered the

-6-

chest cavity, perforated the left lung, and hit a large blood vessel on the right side as it went from left to right. (*Id.*, 248-49). This gunshot wound also showed gunpowder stippling, indicating that the muzzle of the gun was close to the victim. The doctor opined that the head wound was probably the last to be sustained, as the blood loss from this wound was relatively minor. (TT I, 249-50). All of the bullets entered the victim's back or side; none entered from the front. (*Id.*, 251).

Gregory Gwizdowski

Gregory Gwizdowski, the owner and president of Northpoint Mortgage Company, testified that the decedent had been employed as a loan officer since 1995. (TT I, 256-57). The victim was instrumental in getting petitioner a job at the company. (*Id.*, 258-59). Although the decedent, Mr. Polish, was an outstanding worker, petitioner was only adequate. (*Id.*, 259-60). Petitioner left the mortgage company about five months after getting the job. (*Id.*). John Polish then left the company's employ in late 1997. (*Id.*, 261-62). In early 1998, petitioner came back to work for the mortgage company, and Polish returned to work in the summer of the same year. (TT I, 263-65). Gwizdowski testified that petitioner began to grow resentful of Polish. (*Id.*, 264-65, 268-69). Petitioner began to show signs of stress, missing work or leaving early. (*Id.*, 268-69). Petitioner ultimately walked off the job in 1998.

In October of 1998, petitioner began to demand money from the mortgage company, allegedly for unpaid commissions. (TT I, 271). In November, petitioner picketed the office. Gwizdowski was so concerned that he attempted to get a personal protection order to keep petitioner away from the office. (*Id.*). In December of the same year, petitioner presented a claim to the Wage and Hour Division of the Michigan Department of Labor for unpaid commissions. (TT I, 272).

Petitioner then began to make threats against Gwizdowski and Polish by both fax and voicemail. (*Id.*, 275-78).  Gwizdowski reported the calls to the St. Clair Police Department.  Petitioner's demands and threats nevertheless continued into 1999.  (*Id.*, 278-80).  When Gwizdowski complained again to the police, they traced the calls to a motel in Florida.  A Florida detective apparently contacted petitioner, and the harassment stopped for a time.  (*Id.*, 280).  At least twice during 1999, petitioner left fax or telephone messages threatening the victim or his wife.  (TT II, 32-34).

Sheri Polish

Sheri Polish, the widow of the decedent, testified that petitioner and her husband had been friends and fraternity brothers in college.  (TT II, 50-51).  She related a series of harassing telephone calls from petitioner from the summer of 1999 through the spring of 2002.  She heard petitioner say at least fifteen times that "John [the decedent] is a thief.  You need to get your family out because I'm coming to get you."  (*Id.*, 52-55).  Mr. and Mrs. Polish reported these threats to the Waterford Township Police, as well as their neighbors.  (*Id.*, 55).  They were so concerned that they installed an alarm system in their house in September of 1999 and attempted without success to get a personal protection order.  (*Id.*, 56).  In the spring of 2002, they received a call from petitioner and realized that he had returned from Florida to Michigan.  They were concerned that petitioner was back in the vicinity.  (*Id.*, 58).

On August 20, 2002, the date of the murder, Mrs. Polish was taking a class with a friend.  (TT II, 64-65).  She returned home when summoned by police and was told by her children that "a bad man ran in and shot Daddy three times."  (*Id.*, 70).

Christian Collis

        Christian Collis, a personal injury lawyer, lived on the same street as the Polish family.  He was returning to work on the night of the murder at about 7:45 p.m., when he saw a white or gray Ford Tempo make a u-turn and park next to John Polish's driveway.  (TT II, 79-83, 148).  Collis parked his car and then walked to the curb to get his garbage can.  At that point, he saw petitioner sitting in the car parked in front of the decedent's house.  (*Id.*, 84-85, 110-11).  He observed petitioner get out of the car and walk into Polish's garage through the open door.  (*Id.*, 85-86).

        Shortly thereafter, children began to run out of the Polish home screaming and yelling that "somebody shot their dad."  (TT II, 88).  Collis grabbed his cell phone and called 911.  (*Id.*).  Collis went into the Polish home and saw John Polish's body.  He noticed a gunshot wound in the back and what looked like a hematoma developing in the forehead.  (*Id.*, 91).  Collis checked for a pulse and concluded that Polish was dead.  (*Id.*, 93).  Collis authenticated photographs that depicted the crime scene, including the gunshot wounds that he had observed in the decedent's body.  (*Id.*, 93-96).

Cheryl Biron

        Cheryl Biron lived in the same neighborhood and was the mother-in-law of Christian Collis.  (TT II, 106-07).  On the evening of the murder, she was talking to Mr. Collis as he retrieved garbage cans from the curb.  She noted a car parked on the wrong side of the street near the driveway of the Polish house.  (*Id.*, 111).  She testified that she saw children running from the Polish house and screaming and that one of them said, "He shot my Dad."  (*Id.*, 111-12).  One of the Polish

children said that the "man" did not have a shirt.  (*Id.*, 113).  The same child also said that the man had pointed a gun at him.  (*Id.*, 114).

Vanessa Giroux

Vanessa Giroux was a neighbor of the Polish family.  On the night of the murder, her children were at the Polish house, playing with their children. (TT II, 122).  Vanessa and her husband Mark were sitting on the deck when they observed a white four-door car parked near the Polish driveway.  (*Id.*, 125-26).  She testified that she heard "four or five popping sounds" and then saw "a person walking from the direction of the Polish garage."  (*Id.*, 127).  She noted that the man was wearing jeans but no shirt. She then turned to her husband and said, "Oh my God!  Those were gunshots!  That man just shot John!"  (*Id.*, 127-28).

Mrs. Giroux observed the man without a shirt walk towards the car and saw him throw something in the front seat, although she could not tell what the object was.  The man then got into the car.  (*Id.*, 128-29).  Her husband Mark, an off-duty police sergeant, got in his Jeep Cherokee and drove to the Polish house.  She followed in her own car.  She saw her children running out of the house and screaming.  One of her sons said, "That man just shot John!" pointing in the direction of the white car as it exited the neighborhood.  (*Id.*, 130).

Mrs. Giroux then entered the Polish house to see if she could help.  She described the condition of the victim's body, which led her to believe that he was already dead.  (*Id.*, 131).  She then called the police and gave a description of the car.  (*Id.*, 131-32).  The dispatcher kept her on the telephone and, about five or six minutes later, told her that the police had a suspect in custody.  (*Id.*, 132-33).

Mark Giroux

      Mark Giroux, husband of Vanessa Giroux, was a Waterford Township police sergeant. He was off-duty at the time of the incident. (TT II, 142-43). His testimony concerning what he and his wife observed from their deck was consistent with the testimony of Vanessa Giroux. (TT II, 143-48). As a police officer, he noticed immediately that the white Ford was parked illegally on the wrong side of the street. (*Id.*, 148). The car was unoccupied at the time he first saw it. (*Id.*, 151). He heard what he believed to be five gunshots from the direction of the Polish home. (*Id.*). Giroux identified petitioner as the man he saw emerging from the north corner of the Polish driveway walking at a fast pace towards the white Ford. (*Id.*, 151-52). Giroux confirmed that petitioner had no shirt on at the time. (*Id.*). Giroux got in his car and sped off to the Polish residence, because his two children were in the house along with the Polish children. (*Id.*, 154). The children were all screaming and had "the look of terror" in their eyes. His son pointed towards the white Ford Tempo saying, "Dad, that guy just shot John!" (*Id.*, 154-55). Giroux then drove after him and followed him out of the subdivision. (*Id.*, 155-56).

      When petitioner's car reached Williams Lake Road, he stopped at a light, and Giroux was able to get directly behind him. (*Id.*, 158). Giroux followed petitioner's car into a residential area. Giroux then realized that he had neither a gun nor a cell phone and became concerned that petitioner was leading him into a trap. He then began to follow at a greater distance. Ultimately, he identified himself to a woman, who let him borrow her cell phone. (*Id.*, 159). He continued to follow petitioner's car, but lost him for thirty to forty-five seconds on Williams Lake Road. He then called 911 on the cell phone and reported petitioner's position. The police department already had many units dispatched to the area, and petitioner was apprehended almost immediately. (*Id.*, 160-

-11-

61).  Giroux pulled up to the white Ford Tempo and saw that officers had already handcuffed petitioner, who was lying face down.  (*Id.*, 161-62).

On cross-examination, Giroux admitted that he was very angry and very upset.  He admitted that he ran over to petitioner and started screaming profanities at him.  (*Id.*, 165).  Giroux screamed at petitioner, "My kids were in the house!"  Petitioner replied very calmly, "I didn't hurt any kids."  (*Id.*, 166).

Mike Post

Mike Post was a police officer with the Waterford Township Police Department who was on patrol in a marked patrol car on the evening of the murder.  (TT II, 169-70).  Dispatch alerted him that there had been a shooting and that the suspect was a white male without a shirt driving a white or gray Ford Tempo.  (TT II, 170-71).  While he was northbound on Williams Lake Road, he noticed a white Ford Tempo with a white male driver wearing no shirt.  The officer turned around to stop the vehicle, and the vehicle immediately pulled over to the right.  (*Id.*, 170-71).  The driver got out of the vehicle with his hands up.  Officer Post identified petitioner as the man driving the white Ford Tempo.  (*Id.*, 172).

Without being told to do so, petitioner got on the ground in a sprawled-out position, even before the officer was able to leave his own vehicle.  (TT II, 173).  Post then handcuffed petitioner.  He patted him down and found eight to ten live rounds of .38 caliber ammunition in petitioner's pocket.  (*Id.*, 173-75).  Officers then placed petitioner in the back of another squad car without incident.  (*Id.*, 175-76).

-12-

Officer Post returned to petitioner's car and looked through the window, where he saw a shirt on the passenger seat.  He opened the door, lifted up the shirt, and found a .38 caliber blue revolver with a wooden handle.  (TT II, 176-77).  He looked in the back seat, where he saw a Tupperware bowl on the floor with several more rounds of .38 caliber ammunition.  (*Id.*, 177).  The officer then waited for the crime scene unit to arrive.  (*Id.*, 180).

<u>Christopher S. Tippen</u>

Christopher S. Tippen was the crime scene investigator for Waterford Township Police Department.  (TT II, 181).  On August 20, 2002, at around 8:00 p.m., he was directed to report to the Polish house for a possible homicide investigation.  (TT II, 184).  He retrieved a spent bullet that he saw fall from the decedent's midsection.  (*Id.*, 189).  In addition, two other spent bullets were found in the living room area.  (*Id.*, 191).  He also found a bullet lodged in the roof of the building, which had traveled through the ceiling in the living room.  (*Id.*, 192-93).

CSI Tippen later observed the autopsy performed by Dr. Dragovic.  Dr. Dragovic provided him with two bullets retrieved from the decedent's body, one from the chest and the other from the skull.  (TT II, 196-97).

Police obtained a warrant to search petitioner's automobile and then towed it to the forensic garage on August 21, 2002.  (TT II, 198).  Tippen retrieved the Smith & Wesson .38 caliber revolver that Officer Post had earlier seen on the front seat of petitioner's car.  (TT II, 200).  The gun contained five fired .38 caliber casings and one live round.  (*Id.*, 201).  He also obtained clothing from petitioner, including a pair of shoes.  (TT II, 206).  Additionally, Tippen swabbed petitioner's

hand in an effort to determine whether any gunpowder residue was present.  He found residue on the back of petitioner's right hand.  (*Id.*, 208-10).

In lieu of further testimony, the parties stipulated that the witnesses that the prosecutor could have called would have established:  (1) the bullets retrieved from the crime scene and from the victim's body all were fired from the weapon that was recovered from the car; (2) the blood on petitioner's right shoe was that of the victim, John Polish, as established by DNA testing to a probability of 14.8 billion to one; (3) the blood found on petitioner's shoe could not have come from petitioner; (4) the test taken on petitioner's right hand showed that he could have fired a gun recently. (TT II, 220-23).

At the close of the prosecution's case, defense counsel moved for a directed verdict of acquittal on the charges of first-degree, premeditated murder and first-degree felony murder. Counsel conceded that the prosecution had established a *prima facie* case that John Polish was killed and that petitioner had caused the death, but argued that the proofs were insufficient to show that petitioner harbored the requisite specific intent to kill or that he had the requisite specific intent to commit first-degree home invasion.  Counsel therefore requested that the charge be reduced to second-degree murder.  (TT II, 224-25).  The prosecutor argued that the circumstantial evidence, including an "execution-style shot" to the back of the head established the requisite intent to kill. (*Id.*, 226-27).  The court found that the evidence, viewed in the light most favorable to the prosecution, would allow the jurors to find petitioner guilty of both first-degree, premeditated murder and felony murder.  (*Id.*, 227-28).

At the request of defense counsel, the court placed petitioner under oath outside the presence of the jury to make a record of petitioner's voluntary choice not to testify.  Defense counsel

examined petitioner, establishing that petitioner understood he had "an absolute right to testify during the trial."  (TT II, 229).  Likewise, petitioner testified that he understood that he had an "absolute right" to remain silent.  Petitioner affirmed that he had advised his counsel, in light of all the options, that he did not want to take the witness stand, and that he made this decision freely and voluntarily.  (*Id.*, 229-30).  Petitioner further testified that he had instructed his counsel to proceed with the strategy of seeking an instruction on second-degree murder, a lesser-included offense, rather than "going for broke" on the offense charged.  (*Id.*, 231).  Petitioner confirmed his satisfaction with the advice counsel had given him on both the decision not to testify and the strategy to be pursued.  (*Id.*, 231-32).

The defense rested without calling any witnesses.  Petitioner did, however, admit defense exhibits A through F during the testimony of CSI Tippen, which showed the interior of petitioner's car.  (TT II, 217-20).

The court recalled the jury, and counsel delivered their final arguments.  Defense counsel's argument did not seek to denigrate the victim or the witnesses.  Counsel carefully reviewed the evidence, attempting to persuade the jury that petitioner lacked the requisite intent to kill.  "It's all about whether or not he formed that intent. . . ."  (TT II, 269).  He argued that petitioner was thinking less and less rationally as the years wore on and asserted that the facts showed "deterioration" of petitioner's mental state.  (*Id.*, 271, 274).

> I submit to you that there's no way that this man, given his history, the things we know about him, was able to form the necessary intent to commit the crime charged of first-degree premeditated murder.  Furthermore, he wasn't able to form the necessary intent to commit the crime of first-degree home invasion, because that, too, requires his intent to go into that house and commit a murder, where he would have to premeditate, deliberate.  He wasn't able to do all of that on that date.

-15-

(TT II, 277).  Counsel pointed to the pictures of petitioner's car, which apparently was filled with junk, as evidence of petitioner's "deterioration."  (*Id.*, 273-74).  In accordance with the strategy approved by petitioner under oath only moments before, counsel asked the jury to find petitioner guilty of a lesser-included offense.  (*Id.*, 280).

The court then instructed the jury, setting forth the elements of each of the crimes charged, as well as the lesser-included offense of second-degree murder.  (TT III, 3-23).  Defense counsel pronounced himself satisfied with the charge as delivered.  (*Id.*, 23).  The jury deliberated for less than an hour, returning a verdict of guilty on all six felony charges.  (*Id.*, 26).

Petitioner and counsel appeared before Judge Colleen O'Brien on September 30, 2003, for purposes of sentencing.  The court sentenced petitioner to mandatory terms of life imprisonment, without possibility of parole, on each of the first-degree murder convictions.  The court also imposed three consecutive terms of two years each on the felony-firearm charges, in addition to an order of restitution.  (*See* Sentencing Transcript, docket # 21).

## B.    Appellate Proceedings

Petitioner appealed as of right to the Michigan Court of Appeals.  The appellate brief filed by appointed counsel raised the following three issues for review:

I.     The trial court reversibly erred in denying the defense motion for a directed verdict.

II.    The trial abused its discretion and reversibly erred in admitting into evidence gruesome photographs of the victim.[2]

III.   The trial court violated the double jeopardy protections of the U.S. and Michigan Constitutions and reversibly erred in entering judgment on three

---

[2] Copies of the six photographs at issue are found in the Court of Appeals record, docket 22.

counts of felony firearm and on both the first-degree premeditated murder
and felony murder convictions.

(Defendant-Appellant's Brief on Appeal, found in Court of Appeals record, docket # 22).  In

addition, petitioner filed his own *pro se* brief and motion for remand.  The motion to remand argued

that petitioner had been denied the effective assistance of counsel.  The *pro se* brief was mostly

written out in longhand and was only marginally coherent.  The *pro se* brief asserted that trial

counsel failed to set forth a "self-defense theory," failed to suppress evidence of identification and

search and seizure, failed to present witnesses who would testify favorably to the defendant and

failed to establish a viable theory of defense.  The brief also raised a Confrontation Clause issue,

invoking *Crawford v. Washington*, 541 U.S. 36 (2004), arising from the testimony of Mrs. Polish

and Mrs. Biron, both of whom repeated statements made by the children as they ran from the crime

scene.  Petitioner argued that counsel's failure to object to this evidence represented ineffective

assistance of counsel.  Attached to the motion was petitioner's affidavit, in which he claimed that

he had tried to explain to trial counsel that he was compelled to use deadly force in self-defense.  The

affidavit, however, was couched in legalistic terms and contained no statement of facts that might

support a claim of self-defense.

A panel of the Michigan Court of Appeals issued an unpublished, *per curiam* opinion

on March 24, 2005.  The opinion dealt only with the three issues raised in counsel's brief.  First, with

regard to the sufficiency of the evidence, the court found that "substantial evidence" of premeditation

and deliberation was set forth before the jury.  "Evidence of defendant's continuing threats of

violence; the circumstances surrounding defendant's arrival at, entry, and departure from the victim's

home; defendant's possession of the murder weapon; and the orientation and location of the gunshot

wounds established these essential elements of premeditated murder." (Op., 2). The court also found sufficient evidence to support felony murder, on the theory that the murder was committed during the perpetration of first-degree home invasion. (Op., 2-3). Second, the court reviewed counsel's challenge to the admission of photographs of the victim, which was based solely on state-law grounds. Applying an abuse-of-discretion standard, the court found that the trial court had not committed error. The photographs were relevant to facts of consequence in the trial, as they showed location of the wounds and the fact that the victim had been shot at close range, tending to make the existence of the requisite intent to kill more probable. Furthermore, the photographs corroborated the testimony of numerous prosecution witnesses regarding the nature and location of the victim's wounds. The court found that the probative value was not substantially outweighed by the danger of unfair prejudice. (Op., 3). Third, the court agreed with petitioner's double jeopardy challenge to his conviction for both premeditated and felony murder. Where dual convictions of first-degree premeditated murder and first-degree felony murder arise out of the death of a single victim, the dual convictions violate double jeopardy under Michigan law. The court therefore directed the judgment to be modified to indicate a single first-degree murder conviction, supported by two theories. Likewise, the court determined that three convictions on the felony firearm charges also violated double jeopardy and directed to the entry of an amended judgment on that issue as well. (Op., 3-4).

Petitioner filed a *pro se* application for leave to appeal to the Michigan Supreme Court. His application challenged the sufficiency of the evidence, the trial court's decision to admit the six pictures of the victim, the effectiveness of counsel, the alleged admission of perjury during the prosecution's case, and the "accumulation of due process violations." (*Pro per* Application for Leave to Appeal, found in Supreme Court record, docket # 23). The supporting brief, 46-pages in

length, was a nearly incomprehensible conglomeration of legal citations and sentence fragments. By standard order entered November 29, 2005, the Michigan Supreme Court denied discretionary review.

Petitioner filed the present habeas corpus action by submitting a *pro se* petition on January 5, 2006. Read with the required liberality, the petition sets forth four grounds for habeas corpus relief: (1) knowing use of perjured testimony by the prosecution; (2) ineffective assistance of trial counsel; (3) prosecutorial misconduct and due process violations; and (4) insufficiency of the evidence. Respondent rather charitably concedes that these claims were properly exhausted in the state appellate courts, although the state Court of Appeals only addressed those issues raised in counsel's appellate brief.

## **Applicable Standard**

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied sub nom.*, *Texas v. Penry*, 547 U.S. 1200 (2006); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a

state court adjudicated the claim, deferential AEDPA standards must be applied.  28 U.S.C. § 2254(d).  Even if a state court disposes of a constitutional claim without articulating its analysis, deferential review is required.  The Sixth Circuit describes the review AEDPA requires under such circumstances as "modified AEDPA deference." *Vasquez v. Jones*, 496 F.3d 564, 569-70 (6th Cir. 2007); *Moldonado v. Wilson*, 416 F.3d 470, 475-76 (6th Cir. 2005); *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005).  Under the modified standard, "a federal habeas court must conduct an independent review of the record and applicable law to determine whether, under the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.  The independent review, however, is not a full *de novo* review of the claims.  As we held in *Harris* [*v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)],  this standard of review requires the court to conduct a careful review of the record and applicable law, but nonetheless, bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law." *Maldonado*, 416 F.3d at 476.  *De novo* review is restricted to instances where the state court did not address the merits of a claim.  In that limited set of circumstances,  "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir.), *cert. denied*, 128 S. Ct. 708 (2007); *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006); *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) ("[W]hen a claim has not been adjudicated on the merits in State Court proceedings, and has not been procedurally defaulted, we look at the claim *de novo* rather than through the deferential lens of AEDPA.") (citations omitted); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823,

829 (6th Cir. 2005)(quoting *Williams*, 529 U.S. at 409).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007); *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006)("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."), *cert. denied sub. nom. Keith v. Houck*, 127 S. Ct. 1881 (2007); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005)("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.")(citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d).  This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008).  This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar.");  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d at 943.

-22-

The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003)(quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir. 2008). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004)(describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry"). "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*, 418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at 455). "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence 28 U.S.C. § 2254(e)(1); *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1897 (2008); *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007); *Sinkfield v. Brigano*, 487 F.3d 1013, 1016 (6th Cir.), *cert. denied*, 128 S. Ct. 401 (2007). This presumption of correctness

is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449

U.S. 539, 546 (1981); *Lundgren v. Mitchell*, 440 F.3d 754,  763 (6th Cir. 2006).

## Discussion

### I.      Knowing Use of Perjured Testimony

Petitioner's first claim for habeas corpus relief is that the prosecutor knowingly

presented perjured testimony.  Because the state Court of Appeals did not address the merits of this

claim, review in this court is *de novo*.  *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *McKenzie*

*v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003).  Consequently, no deference is paid to the result in the

state Court of Appeals, as there is no reasoning to which the habeas court can defer.  *McKenzie*, 326

F.3d at 727.

The Fourteenth Amendment right to due process prohibits a knowing and deliberate

use by a state of perjured evidence in order to obtain a conviction.  *See Napue v. Illinois*, 360 U.S.

264, 269 (1959).  This claim encompasses use of testimony, whether elicited or left uncorrected, that

the prosecutor knows or should know is false.  *See Giglio v. United States*, 405 U.S. 150 (1972).

The presentation of perjured testimony, without more, does not rise to the level of a constitutional

violation.  *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983).  Rather, it is the knowing and deliberate

use of perjured evidence by the prosecution that creates a constitutional infringement.  *See Foley v.*

*Parker*, 488 F.3d 377, 391-92 (6th Cir. 2007), *cert. denied sub nom. Foley v. Simpson*, 128 S. Ct.

2507 (2008); *Burks v. Egeler*, 512 F.2d 221, 229 (6th Cir. 1975).  The defendant must show that the

statement in question was "indisputably false," rather than merely misleading.  *Byrd v. Collins*, 209

F.3d 486, 517 (6th Cir. 2000).

-24-

The most cogent explanation of petitioner's claim of perjured testimony is set forth in his "traverse" at pages 21 through 25.  Petitioner asserts that the testimony of Gregory Gwizdowski, Sheri Polish, and Sgt. Giroux was false.  He asserts that Gwizdowski misrepresented the nature of the dispute between petitioner and his former employer and that he misstated and mischaracterized the nature and timing of the threats that petitioner communicated to him.  He asserts that Mrs. Polish should have known that petitioner never made a threat against her.  Finally, he asserts that Sgt. Giroux lied when he denied assaulting petitioner when petitioner was handcuffed on the ground.  Petitioner argues that the jury may have discounted Giroux's entire testimony had it known that Giroux assaulted petitioner.

Petitioner's bald accusations of perjury are not supported by any factual basis. Conclusory and uncorroborated allegations of perjury, or assertions of inconsistencies in a witness's testimony, fall far short of establishing a due-process violation.  *See Barnett v. United States*, 439 F.2d 801, 802 (6th Cir. 1971).  Furthermore, the alleged inconsistencies that petitioner raises are immaterial and do not undermine either the substance of these witnesses' testimony or their credibility.  Finally, petitioner has presented absolutely no basis to conclude that the prosecutor knew or should have known of the alleged falsehood.  Accordingly, even under a *de novo* standard, petitioner's naked assertions do not establish grounds for habeas corpus relief.

## II.    Ineffective Assistance of Counsel

Petitioner asserts that his trial lawyer was ineffective for failure to investigate, failure to present exculpatory evidence, failure to present a self-defense theory, failure to object to evidence violating the Confrontation Clause and failing to move to suppress illegally-seized evidence.

Because the state Court of Appeals did not directly address the claim of ineffective assistance of trial counsel, this court must accord this claim *de novo* review.

To prove ineffective assistance of counsel, a petitioner must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland* requires that reviewing courts accord a high level of deference to counsel's performance. *Id.* at 689. Counsel renders ineffective assistance when his performance falls below "an objective standard of reasonableness." The courts, however, accord a "strong presumption" that counsel's performance was professionally reasonable. *Id.* at 689. Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. None of plaintiff's claims of ineffective assistance of counsel withstands scrutiny under this standard.

In support of his contentions, petitioner sets forth a version of the events of August 20, 2002, never presented at trial. He asserts that John Polish invited him to Polish's house to discuss the longstanding dispute over commissions. Once petitioner entered the house, Polish, a much larger man, attached him with his fists. Petitioner pulled his handgun during the attack, sending one bullet through the ceiling. As Polish was pummeling him, petitioner shot Polish through the forearm. The bullet passed through Polish's forearm and struck him in the neck. Nevertheless, Polish continued to strike petitioner, who shot in self-defense. The last shot struck Polish in the back of his head. (Traverse at 2-3). Petitioner's claims of ineffective assistance of trial counsel are based upon the assumption his present version of the facts is correct and that the facts presented at trial are false.

Petitioner first asserts that counsel failed to conduct a proper investigation. Certainly, counsel's failure to investigate can abridge the Sixth Amendment right to the effective assistance of counsel. *See Dando v. Yukins*, 461 F.3d 791, 801-02 (6th Cir. 2006). Petitioner, however, does not explain what, if anything, an investigation might have uncovered. He faults counsel for failing to hire an investigator and to engage a ballistics expert to study the bullets found at the crime scene. Petitioner has already admitted, however, that he fired the fatal shots, so a ballistics expert would have availed petitioner nothing. He also faults counsel for failing to subject the children who witnessed the killing to examination by a child psychologist, apparently believing that such an examination would undermine the truth of their stories. As the children did not testify, it is impossible to discern how such an examination might have advanced petitioner's defense.

Petitioner next faults counsel for failure to object to evidence admitted in violation of the Confrontation Clause. Petitioner focuses on the statements made by the children as they ran screaming from the crime scene, to the effect that, "that man" shot John Polish. Petitioner asserts that the children's statements violated petitioner's rights under the Confrontation Clause under *Crawford v. Washington*, 541 U.S. 36 (2004).[3] Petitioner's understanding of *Crawford* is fundamentally incorrect. The Confrontation Clause, as authoritatively construed in *Crawford*, applies only to "testimonial" hearsay evidence. 541 U.S. at 53-54. The Court held that admission of "testimonial hearsay violates the Confrontation Clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant." *Id.* at 68. By contrast, if the hearsay statement is "non-testimonial," the Confrontation Clause simply does not apply, and the

---

[3] *Crawford* was decided in 2004, but petitioner's trial was in 2003. Defense counsel therefore could not possibly have raised an objection under *Crawford*. Even so, had *Crawford* been decided before the trial, it would not have affected the admissibility of the children's statements.

issue is governed by state hearsay rules.  *Id.* at 60-61.  In general, a statement is testimonial when, in the totality of the circumstances, the statement is taken by police as part of their investigation of past events potentially relevant to criminal proceedings.  *See Davis v. Washington*, 547 U.S. 813, 822 (2006).  "The proper inquiry . . . is whether the declarant intends to bear testimony against the accused.  That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."  *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). Consequently, the Confrontation Clause does not apply to spontaneous out-of-court statements made outside the investigatory context.  *See United States v. Franklin*, 415 F.3d 537, 545 (6th Cir. 2005); *Ramirez v. Dretke*, 398 F.3d 691, 695 n.3 (5th Cir. 2005).  The statements made by the child witnesses as they ran from the house immediately after the murder were uttered to their parents and neighbors, not to police investigators.  The Confrontation Clause simply does not apply, and an objection on this basis would have been futile.  Contrary to petitioner's argument, the fact that the children may have made some of their statements in response to questions by adults does not change this result.  No reasonable children in that circumstance would believe that their terrified shouts, or their responses to their parents' questions, would be part of a police investigation.  Similarly, an objection under the state hearsay rules would have been futile, as the children's statements clearly qualified as excited utterances under the hearsay exception created by Mich. R. Evid. 803(2).  *See People v. Smith*, 581 N.W.2d 654, 657 (Mich. 1998).

Petitioner next challenges his attorney's failure to present the defense of self-defense. Under Michigan law, the use of deadly force against another in self-defense by one who is free from fault is justified if, under the circumstances, the person honestly and reasonably believes that he is

in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force.  *People v. Riddle*, 649 N.W.2d 30, 34 (Mich. 2002).  The touchstone of self-defense is necessity.  The failure to retreat or otherwise avoid the intended harm may therefore indicate a lack of necessity in resorting to the use of deadly force.  *Id.* at 35.  It should be obvious that a claim of self-defense would have been nearly impossible to maintain in the circumstances of this case, where the killing occurred only seconds after petitioner entered the house, the victim was unarmed, and all of the allegedly "defensive" bullet wounds entered the victim's body from the side or back.  Most tellingly, petitioner delivered the final shot to the victim's head, after the victim was probably dead, at close range.  The decision whether to defend the case on the basis of self-defense was a strategic one, as Michigan law requires the defendant to admit the criminal act charged in order to maintain the defense.  *See People v. Lemons*, 562 N.W.2d 447, 453 n.15 (Mich. 1997).  Consequently, petitioner would have been required to take the witness stand, admit the killing, and tell his story of self-defense, in the hope that the jury would have accepted his version of events.  The Supreme Court has noted that such strategic choices made after investigation of the law and the facts are "virtually unchallengeable," especially when the strategic choice is supported by the defendant himself.  *Strickland*, 466 U.S. at 690-91; *see Moss v. United States*, 323 F.3d 445, 474-75 (6th Cir. 2003) (counsel not ineffective for failure to seek plea agreement where defendant made strategic choice to not plead guilty); *St. Pierre v. Walls*, 297 F.3d 617, 630 (7th Cir. 2002) (counsel's failure to obtain reports on defendant's childhood not ineffective assistance because defendant made informed choice not to put on defense).  In the present case, petitioner stated under oath, on the record, that he had made the strategic decision not to testify.  (TT II, 229-31).  He cannot now fault

his counsel for that strategic decision, especially when the self-defense claim was far-fetched and could not possibly have prevailed.

In a related argument, petitioner faults his counsel for essentially conceding petitioner's guilt to second-degree murder.  Again, petitioner testified under oath that he agreed with this strategy.  (TT II, 231-32).  If petitioner truly believed at the time that he had acted in self-defense, it would have been an easy matter for him to inform the trial judge of this fact and to take the witness stand.  Claims of ineffective assistance of counsel are not available to defendants on the basis of hindsight or afterthought.  *Strickland*, 466 U.S. at 689.

Finally, petitioner asserts that his counsel was ineffective for failing to suppress the fruits of an allegedly illegal search of petitioner's person and automobile.  Petitioner, however, presents no plausible grounds upon which either search would have been subject to a good-faith motion to suppress.  Officers found .38 caliber ammunition on petitioner's person when they arrested him.  Warrantless searches of arrestees are valid when conducted incident to a lawful custodial arrest.  *See Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979); *United States v. Robinson*, 414 U.S. 218, 235 (1973).  Petitioner's contention that he was searched pursuant to an unlawful *Terry* stop is untenable.  Under *Terry v. Ohio*, 392 U.S. 1 (1968), officers have a limited right to search for weapons when conducting an investigative stop based on reasonable suspicion.  Petitioner's arrest was not a *Terry* stop, but was a felony arrest.  Officers searching a person incident to arrest may conduct a full search for both weapons and evidence.  *Robinson*, 414 U.S. at 229.  Moreover, when police make a valid arrest of a person who has recently occupied a vehicle, police may search the passenger compartment and any containers within it.  *See Thornton v. United States*, 541 U.S. 615, 622 (2004) (police can search entire vehicle passenger compartment incident to arrest of someone

inside car or who was a recent occupant).  Officer Post was therefore not in violation of any Fourth

Amendment stricture when he lifted the jacket on petitioner's passenger seat and found the murder

weapon.  *See New York v. Belton*, 453 U.S. 454, 462 (1981) (search of jacket on car floor valid as

incident to arrest).  Finally, as police obtained a search warrant for the car, they eventually would

have found both the ammunition and the murder weapon during the execution of that search warrant.

Consequently, counsel's decision not to bring a motion to suppress was eminently reasonable, as the

motion would have had no arguable merit.[4]

      In summary, all of petitioner's claims of ineffective assistance of counsel are

insubstantial and cannot form the basis for habeas corpus relief.

### III.    Prosecutorial Misconduct

      Petitioner asserts as his third claim for habeas corpus relief "Prosecutor[ial]

Misconduct -- Due Process Violations." (Petition, docket # 1, at 9).  Within this category, petitioner

presents a confusing group of accusations, some of which (*e.g.* illegal search and suggestive

identification) overlap claims set forth elsewhere in the petition.  Other claims (*e.g.,* "a group with

a vendetta conducted investigation and trial") are utterly nonsensical and do not merit a serious

response.  To the extent that this constellation of claims is intelligible, ground 3 alleges that the

prosecutor introduced "gruesome pictures" of the victim, engaged in improper argument that "did

not match the evidence," and committed a *Brady* violation.[5]

---

[4] Petitioner also faults counsel for failure to move to suppress the eye witness identifications. This argument is so ridiculous in the circumstances of this case as to require no further analysis.

[5] As noted above, respondent has conceded that all of petitioner's claims were properly exhausted before the state appellate courts.  Consequently, the state has expressly waived the exhaustion requirement.  *See* 28 U.S.C. § 2254(b)(3); *D'Ambrosio v. Bagley*, 527 F.3d 489, 495-96

The state Court of Appeals specifically addressed the question whether the five color pictures of the decedent were properly admitted into evidence. Counsel's brief raised the issue as a pure matter of state law and invoked no due-process principle. Applying an abuse-of-discretion standard, the state appellate court found that the photographs were relevant both to petitioner's intent and to the corroboration of witness testimony and that their probative value was not substantially outweighed by the danger of unfair prejudice. (Op., 3). To justify habeas corpus relief, petitioner would be required to show that this holding of the state Court of Appeals was contrary to, or represented an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d). The Supreme Court has never articulated a clearly established federal standard for the admission of crime scene photographs. To the contrary, the Court generally holds that matters involving the introduction of evidence are governed by state law and cannot justify habeas corpus relief. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness," may it violate due process and therefore warrant habeas corpus relief. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). The Court of Appeals has held that admission of relevant photographs of

---

(6th Cir. 2008). But for the waiver, I would conclude that none of the claims of prosecutorial misconduct was properly presented to the state appellate courts. In the Michigan system, issues are preserved for appellate review by listing them in the "Statements of Questions Involved" in appellant's brief. MICH. CT. R. 7.212(C)(5). The state appellate courts will not review an issue not fairly comprehended in the Statement of Questions Involved. *See People v. Mackle*, 617 N.W.2d 339, 350 n.4 (Mich. Ct. App. 2000); *People v. Miller*, 604 N.W.2d 781, 783 (Mich. Ct. App. 1999); *accord People v. Unger*, 749 N.W.2d 272, 306 (Mich. Ct. App. 2008). Neither the brief filed by appellate counsel nor petitioner's *pro se* brief included any claim of prosecutorial misconduct in the Statement of Questions Involved. Rather, petitioner's brief contained thirty pages of incoherent handwritten argument in which fragments of his present issues could be found. In my opinion, his submission of this "brief" to the state appellate court was insufficient to exhaust any claim not specifically mentioned in the Statement of Questions Involved.

a crime scene or victim, even if gruesome, does not deprive a criminal defendant of a fair trial.  *See Cooey v. Coyle*, 289 F.3d 882, 893-94 (6th Cir. 2002) (Crime scene photographs do not raise the "spectre of fundamental fairness such as to violate federal due process of law."); *accord Skrzycki v. Lafler*, 347 F. Supp. 2d 448, 455 (E.D. Mich. 2004).  Furthermore, it is not prosecutorial misconduct for a prosecutor to present evidence in reliance on the trial court's ruling in favor of admissibility.  *Cristini v. McKee*,  526 F.3d 888, 900 (6th Cir. 2008).  As the photos of the victim's body were clearly relevant to show intent to kill, a necessary element of the murder charge, the trial judge's decision to admit them is constitutionally unassailable, and the prosecutor's offering of such relevant evidence cannot be deemed misconduct.

Petitioner's claim that the prosecutor distorted evidence deserves little comment.  Essentially, petitioner asserts that the prosecutor's final argument distorted the meaning and import of the threatening faxes admittedly sent by petitioner to his former place of employment.  (Copies of these documents are attached to docket # 53).  Petitioner's arguments are no more than quibbles.  Far from fabricating or distorting evidence, the prosecutor argued that the clear import of these faxes was a threat of revenge against both the victim and petitioner's former boss.  The prosecutor's argument was fair and amply supported by the evidence.

Finally, petitioner argues that the prosecutor violated the "rules of discovery" and committed a *Brady* violation.  As an initial matter, there is no constitutional right to discovery in a criminal case.  *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  Consequently, petitioner's complaints that the prosecutor violated state-law discovery rules is not grounds for habeas corpus relief.  Petitioner's invocation of *Brady v. Maryland*, 373 U.S. 83 (1963), is unavailing.  In *Brady*, the Supreme Court held that due process requires the prosecution to disclose evidence favorable to

an accused when such evidence is material to either guilt or punishment. *Id.* at 87. Petitioner's principal claim under *Brady* is that the prosecutor "obstructed the defense" by failing to produce witness statements until the day of trial. It is impossible that this conduct, if true, would constitute a constitutional violation. As a primary matter, a state prosecutor has no constitutional duty to disclose all witness statements under *Brady*. *Brady* only covers exculpatory information. *See United States v. Agurs*, 427 U.S. 97, 109-10 & n.16 (1976). Furthermore, even in federal prosecutions, witness statements need not be disclosed until after the witness has testified on direct examination. *See* 18 U.S.C. § 3500. The Supreme Court has never held that the Constitution requires production of witness statements any earlier than the time of trial. *See generally United States v. Presser*, 844 F.2d 1275 (6th Cir. 1988) (court has no power to order production of witness statements before witness testifies).

The other prong of petitioner's *Brady* claim is that the prosecutor failed to procure records from the Department of Labor relevant to petitioner's claim that he had been cheated out of commissions. Such information, if it existed at all, could not fall within *Brady*, because it was neither material nor exculpatory. If petitioner had a meritorious claim for wages, he should have brought a civil lawsuit. The mere fact that petitioner's former employer might have owed him money was not license for petitioner to kill John Polish in cold blood.

None of petitioner's claims of prosecutorial misconduct or due-process violations withstands even the slightest scrutiny. These claims are not supported by any clearly established Supreme Court authority, and they are likewise not supported by the record.

-34-

IV.     **Insufficiency of the Evidence**

Petitioner's fourth habeas corpus claim is that the evidence was insufficient to support the jury's verdict.  Under *Jackson v. Virginia,* 443 U.S. 307 (1979), a habeas petitioner challenging a state court conviction "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324. In examining the sufficiency of the evidence to support a state conviction, this Court must give deference to the fact-finder's determination based on "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 319.   A federal court "will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Blakeney,* 942 F.2d 1001, 1010 (6th Cir.1991); *see United States v. Drake*, No. 07-5157, 2008 WL 2224811, at * 3 (6th Cir. May 29, 2008).  The Sixth Circuit has "defined substantial evidence as being 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred.'" *United States v. Grubbs,* 506 F.3d 434, 438 (6th Cir. 2007) (quoting *United States v. Martin,* 375 F.2d 956, 957 (6th Cir.1967)).  Circumstantial evidence alone may constitute substantial evidence where it "can sustain a guilty verdict and ... [such] evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Hughes,* 505 F.3d 578, 592 (6th Cir.2007) (quoting *United States v. Stone,* 748 F.2d 361, 362 (6th Cir.1984)). In evaluating the evidence adduced at trial, this court must "view all evidence and resolve all reasonable inferences in favor of the government." *Hughes*, 505 F.3d at 592.

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove "all elements of the offense charged, and must persuade the fact finder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." *Sullivan v. Louisiana,* 508 U.S. 275, 277-78 (1993) (internal citations omitted). Therefore, in reviewing the sufficiency of the evidence to support a jury's verdict, this court must "do so 'with explicit reference to the substantive elements of the criminal offense as defined by state law.' " *Parker v. Renico,* 506 F.3d 444, 448 (6th Cir.2007) (quoting *Jackson,* 443 U.S. at 324 n.16.). "Common law murder encompasses all killings done with malice aforethought and without justification or excuse." *People v. Mendoza*, 664 N.W.2d 685, 689 (Mich. 2003). First-degree murder is a statutory offense. *Id.* The statute defines first-degree murder as, among other things, "murder perpetrated by means of poison, lying in wait, or any other wilful, deliberate, and premeditated killing." MICH. COMP. LAWS § 750.316(1)(a). The necessary elements of premeditation and deliberation may be found to exist by the jury "when a thought process, undisturbed by hot blood and involving reflection upon a planned course of conduct fully measuring and evaluating the consequences of a killing, is found to have been formed in the mind of the defendant." *People v. Martin*, 221 N.W.2d 336, 339 (Mich. 1974). Premeditation and deliberation require sufficient time to allow the defendant to "take a second look." *See People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 187 N.W.2d 434, 449 (Mich. Ct. App. 1971); *accord McCullough v. Stegall*, 17 F. App'x 292, 296 (6th Cir. 2001). Under Michigan law, the minimum time required for premeditation is "incapable of exact determination." *Marsack v. Howes*, 300 F. Supp. 2d 483, 490 (E.D. Mich. 2004) (citing Michigan cases). It may be merely seconds or minutes or hours, depending

-36-

on the totality of the circumstances surrounding the killing. *Id.* at 491. Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove these elements. *Id.* (citing *People v. Jolly*, 502 N.W.2d 177, 180 (Mich. 1993)).

The Michigan Court of Appeals ruled directly on this claim, which petitioner's appointed counsel raised on appeal. Review of this issue must therefore be conducted under the AEDPA standard, which the Sixth Circuit has recently described as "very deferential." *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007). Review of challenges to the sufficiency of the evidence under this standard is best understood as proceeding under the "unreasonable application" prong of the statute. *See Thompson v. Bock*, 215 F. App'x 431, 435 (6th Cir. 2007). In other words, such an argument is properly understood as an allegation that the state court's decision resulted in an unreasonable application of *Jackson v. Virginia*. *See Eady v. Morgan*, 515 F.3d 587 (6th Cir. 2008); *Riley v. Berghuis*, 481 F.3d 315, 320-21 (6th Cir. 2007). Review in such cases "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor." *Thompson*, 215 F. App'x at 436. This standard presents a "very difficult hurdle" for the habeas petitioner. *Id.* at 437. All inferences and credibility determinations must be drawn in favor of the prosecution, and the conviction may be supported wholly or in part by circumstantial evidence. *Id.*

Under the foregoing standard, the decision of the Michigan Court of Appeals easily withstands scrutiny. The appellate court correctly identified the appropriate legal standard, namely, whether the evidence, viewed in a light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime were proved beyond a reasonable doubt. (Op., 2). Relying on state-law precedent, the court found that the evidence was sufficient to prove

-37-

premeditation and deliberation, which require "substantially more reflection on and comprehension of the nature of the act than the mere amount of thought necessary to form the intent to kill."  (Op., 2) (*quoting People v. Plummer*, 581 N.W.2d 753, 757 (Mich. Ct. App. 1998)).  The court found that evidence of petitioner's continuing threats of violence, the circumstances surrounding his arrival at, entry into, and departure from the victim's home, his possession of the murder weapon, and the orientation and location of the gunshot wounds established the essential elements of premeditated murder.  (Op., 2).  The appellate court could have added to its analysis the fact that petitioner shot his victim in the back of the head at very close range after the victim was already dead.  The gunshot wound to the back of the victim's head, which forensic evidence showed to have been fired at a range of no more than twelve inches, both destroyed petitioner's unstated self-defense claim and established a deliberate and premeditated murder beyond any reasonable doubt.[6]

## **Recommended Disposition**

For the foregoing reasons, I conclude that all petitioner's habeas corpus claims are indisputably meritless and recommend that the petition be denied.


Dated:  July 17, 2008                              /s/  Joseph G. Scoville                                  
                                                                United States Magistrate Judge

---

[6] As the evidence clearly established all the elements of premeditated, first-degree murder, it is not necessary to examine the alternative theory of felony murder, which the state Court of Appeals held also had been established beyond a reasonable doubt.

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).